IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION AT MEMPHIS

| | |
|---|---|
| DEAUNDRA BILLINGSLEY,<br><br>    Plaintiff,<br><br>v.<br><br>TWO UNIFORMED MEMPHIS POLICE OFFICERS, PRENTISS JOLLY, MICHAEL W. RALLINGS, and the CITY OF MEMPHIS, TENNESSEE,<br><br>    Defendants. | Case No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

THE PLAINTIFF, Deaundra Billingsley, brings action against the above-captioned defendants based on the following grounds:

### I.

### NATURE OF THE ACTION

1. This is a civil-rights action for damages sustained by a United States Citizen when, on the public street pictured below, two uniformed officers of the Memphis Police Department (the "MPD") employed by the City of Memphis, Tennessee (the "City"), accosted and detained him, searched his person without probable cause or reasonable suspicion, then forcibly penetrated him in the anus. These actions were objectively unreasonable, malicious, and served no legitimate law-enforcement purpose.

Intersection of Red Oak Street and Mimosa Avenue:



Memphis, Tennessee 38112

## II.

## JURISDICTION AND VENUE

2. This action is brought pursuant to 42 U.S.C. §§ 1983, 1985, and 1988; the Fourth, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution; and comparable provisions of Tennessee law. This Court's jurisdiction over the federal causes is predicated on 28 U.S.C. §§ 1331 and 1343(3), (4).

3. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 to adjudicate all state-law claims pendent to the federal claims that are the thrust and gravamen of this action.

4. Pursuant to 28 U.S.C. § 1391(b)(2), venue for this action is properly laid in the Western District of Tennessee, within the territorial boundaries of which occurred all acts, transactions, and events pertinent and giving rise to this action.

### III.

### PARTIES

5. Plaintiff DEAUNDRA BILLINGSLEY is an adult resident of Shelby County, Tennessee, a black man, and a citizen of the United States.

6. Defendants:

(a) JOHN DOE I is, or at all times pertinent was, a white male police officer employed and commissioned by the MPD to perform law-enforcement duties in the City. At all pertinent times, he was acting individually and in such capacity as the agent, servant, and employee of the City within the territory known as MPD Ward 523. Upon information and belief, he was not licensed as a physician or nurse at any pertinent time. His name and further identity are presently unknown, despite diligent inquiry by the undersigned counsel prior to the commencement of this action. Doe I is the subject of an MPD Internal Affairs investigation, ongoing as of July 10, 2020, related to the same conduct that gives rise this action. He is sued individually, for his acts as an individual, and in his official capacity.

(b) JOHN DOE II is, or at all times pertinent was, an Asian or middle-eastern male police officer employed and commissioned by the MPD to perform law-enforcement duties in the City. At all pertinent times, he was acting individually and in such capacity as the agent, servant, and employee of the City within the territory known as MPD Ward 523. Upon information and belief, he was not licensed as a physician or nurse at any pertinent time. His name and further identity are presently unknown, despite diligent inquiry by the undersigned counsel prior to the commencement of this action. Doe II is the subject of an MPD Internal Affairs investigation, ongoing as of July 10, 2020, related to the same conduct that gives rise this action. He is sued individually, for his acts as an individual, and in his official capacity.

(c) PRENTISS JOLLY was at all pertinent times employed and commissioned by the MPD to perform law-enforcement duties in the City and was commissioned as the Precinct Commander for the Tillman Station,[1] and as such, was the commander and supervisor of

---

[1] The Tillman Station is located at 426 Tillman Street, Memphis, Tennessee 38112.

MPD uniformed-patrol operations occurring within MPD Ward 523. Upon information and belief, he was the commanding officer of Defendants Does I and II. At all pertinent times he was acting individually and in such capacity as the agent, servant, and employee of the City. He is sued individually, for his acts as an individual, and in his official capacity.

(d)     MICHAEL W. RALLINGS was at all pertinent times the duly appointed Director of the MPD. As such, he was the commanding officer of Defendants Doe I, Doe II, and Jolly, being thus responsible for these defendants' training, supervision, and conduct. He was also legally responsible for setting and enforcing the policies and regulations of the MPD and for ensuring that all MPD personnel obeyed the laws of the State of Tennessee and of the United States. At all pertinent times, Director Rallings was acting individually and in such capacity as the agent, servant, representative, and employee of the City. He is sued individually, for his actions as an individual, and in his official capacity.

(e)     The CITY is a municipal corporation chartered by, and located within the territorial boundaries of, the State of Tennessee. At all pertinent times, the City employed Defendants Doe I, Doe II, Jolly, and Rallings. It is sued as a person under 42 U.S.C. § 1983.

7.     At all pertinent times and in all their acts or omissions as hereinbelow described, defendants Doe I, Doe II, Jolly, and Rallings were acting under color of state law and pursuant to their actual or perceived authority as police personnel for the City.

## IV.

## GENERAL ALLEGATIONS

8. At some time on or after August 5, 2019, Deaundra Billingsley was walking down a residential street in the Binghamton neighborhood of the City, within MPD Ward 523. He was not committing any crime. He was not suspected of committing any crime.

9. As he walked by the intersection of Red Oak Street and Mimosa Avenue, Mr. Billingsley saw a young man, referred to herein as D.M., whom Mr. Billingsley recognized as the son of a female acquaintance. Mr. Billingsley stopped and struck up a conversation with D.M. This activity was not a crime. It did not give the reasonable appearance of being a crime.

10. An MPD-patrol car pulled up next to the curb where D.M. and Mr. Billingsley were speaking.

11. John Does I and II jumped out of the patrol car and yelled at Mr. Billingsley and D.M. to put their "hands on the hood" of the patrol car.

12. John Doe I detained and patted down Mr. Billingsley's person while John Doe II detained and patted down D.M.'s person.

13. Mr. Billingsley loudly and unequivocally objected to being detained and demanded he be released if not under arrest pursuant to a warrant or probable cause. He continued to repeat this objection and demand. At no time did he give any indication that he consented to being detained or searched.

14. John Doe II placed a small bag of what appeared to be cannabis on the hood of the patrol car, claiming he had recovered it from D.M.'s person. Whereupon, Doe II handcuffed D.M. and laid him face-down across the backseat of the patrol car. Doe II kept the rear door of the patrol car open, bent over, and leaned his body inside where D.M. was lying. It is unclear what Doe II did to D.M. next.

15. At approximately the same time, John Doe I handcuffed Mr. Billingsley's hands behind his back, pressed him against the side of the patrol car and, without responding to Mr. Billingsley's repeated demands to know why he was being detained, began invasively searching his person.

16. Mr. Billingsley never consented to being searched and loudly and unequivocally objected to the MPD officers' detaining and searching him.

17. Doe I had no legal basis to detain or search Mr. Billingsley without consent, and doing so served no legitimate law-enforcement purpose.

18. Upon information and belief, Does I and II would not have detained Mr. Billingsley, and Doe I would not have searched Mr. Billingsley's person without consent, but for the fact that Mr. Billingsley is black.

19. Doe I was much shorter than Mr. Billingsley and, based on the officer's demeanor and tone of voice, appeared to delight in physically controlling the much taller man. He accomplished this by leaning on the handcuffs that were holding Mr. Billingsley's hands behind his back, causing Mr. Billingsley to experience severe pain.

20. In full public view and without consent, Doe I then pulled down Mr. Billingsley's outer pants, reached a hand inside of Mr. Billingsley's undershorts, rubbed his hand over Mr. Billingsley's buttocks, then forcibly inserted one or two fingers into Mr. Billingsley's anus.

21. Mr. Billingsley attempted to pull away from the finger or fingers Doe I had thrust inside of him, but Doe I, by keeping one hand on Mr. Billingsley's handcuffs, managed to hold Mr. Billingsley still and penetrate his anus up to the second knuckle (*proximal interphalangeal*) joint of the officer's hand.

22. Doe I had no legal basis for forcibly inserting his fingers into Mr. Billingsley's anus, and doing so served no legitimate law-enforcement purpose.

23. During this time, upon information and belief, Doe II subjected D.M. to similar unreasonable and conscience-shocking abuse.

24. At some point during Doe I's search of Mr. Billingsley's person, Doe II said to Doe I, "Did you check his asshole good?" The tone and manner of this statement suggested that this was a familiar reminder from one officer to another.

25. Upon information and belief, Doe I would not have forcibly inserted his fingers into Mr. Billingsley's anus without consent, nor would Doe II have directed or encouraged this conduct, but for the fact that Mr. Billingsley is black.

26. By digitally penetrating Mr. Billingsley's anus without his consent and for no legitimate law-enforcement purpose, Doe I subjected Mr. Billingsley to the criminal offense of rape, according to the Tennessee legislature's definition of that offense. *See* Tenn. Code Ann. § 39-13-501(7), 503(a)(1), (2).

27. After Doe I raped Mr. Billingsley, both officers continued to ignore Mr. Billingsley's ongoing demands to be released or informed of the nature of and basis for being detained.

28. Eventually, Doe I forced Mr. Billingsley down to the curb where a crowd of neighbors had gathered around the scene.

29. After Mr. Billingsley had been on the curb for about an hour—the whole time shouting at the officers and demanding to be released—Doe II became visibly annoyed. Doe II looked up from whatever he was doing to D.M. in the backseat of the patrol car and warned Mr. Billingsley that he had "better stop talking."

30. Doe II then pointed to the bag of what appeared to be cannabis on the hood of the patrol car and, impliedly as explanation for *why* Mr. Billingsley should stop talking, threatened, "I can write this up how I want to write it, make it however I want to make it." Doe II was unmistakably threatening to falsely charge Mr. Billingsley with possession of an illicit substance.

31. Threatening to bring false charges against Mr. Billingsley served no legitimate law-enforcement purpose.

32. Upon information and belief, Doe II would not have openly threatened to file false charges against Mr. Billingsley but for the fact that Mr. Billingsley is a black man.

33. As soon as Doe II had threatened Mr. Billingsley as described above, Doe I shouted something to get Doe II's attention. Doe I then demonstrably tapped

his body-worn camera as if to remind Doe II that the entire incident was being recorded. Upon information and belief, Doe II made no further threats or incriminating statements for the duration of the encounter.

34. As the crowd of neighborhood onlookers grew, a second MPD patrol car pulled up to the scene. Doe II approached and spoke to the single officer in this vehicle. Mr. Billingsley saw Doe II and this third officer laughing and pointing in his direction. The third officer then left the scene.

35. After approximately another hour, by which time a sizeable crowd had gathered, the officers released Mr. Billingsley. They had never even asked for his name.

36. Sometime thereafter, the officers released D.M. without charge, got back in their patrol car, and drove away.

37. Within days, Mr. Billingsley reported the above-described incident to MPD internal affairs. The internal-affairs investigation was ongoing as of the City's July 10, 2020 response to the undersigned counsel's Public Records Request (City of Memphis No. W015616-063020). Upon information and belief, no disciplinary action has been taken to date.

V.

CUSTOM, PATTERN, AND PRACTICE

38. At all pertinent times, Police Director Rallings, Precinct Commander Jolly, and the City developed, maintained, tolerated, and failed to remedy customs, patterns, and practices within the MPD generally, and officers from the Tillman

Station in particular, that exhibited a deliberate and callous indifference to the dignity and constitutional rights of citizens with whom MPD officers were likely to interact.

39.  While MPD policies nominally and officially require that detention and searches be supported by probable cause and that any body-cavity search be conducted only upon a signed warrant and by a licensed physician or registered nurse in a private and secure location, certain regular customs, patterns, and practices—of the MPD generally and of officers operating out of the Tillman Station particularly—undermined and contravened the policy's written letter.  These customs, patterns, and practices rendered the written policies ineffective, practically meaningless, and encouraged the sort of cavalier, degrading, and abusive police conduct toward citizens—particularly black citizens from disadvantaged communities like Binghamton—that is the subject of this action.

40.  The ease of manner in which Does I and II detained Mr. Billingsley without cause or explanation—indeed, without even asking him his name—indicates that such conduct is and was part of the typical manner in which MPD officers, particularly those operating out of the Tillman Station, conduct business.

41.  The manner in which John Doe I searched Mr. Billingsley's person and thrust his fingers inside of Mr. Billingsley's anus—without John Doe's objection, but instead his direction, encouragement, or both—indicates that such conduct is part of the typical manner in which MPD officers, particularly those operating out of the Tillman Station, conduct business.

42. The casual, brazen, and familiar way in which Doe II asked Doe I, "Did you check [Mr. Billingsley's] asshole good?" indicates that casual anal penetration of persons in their custody and control is common practice for MPD officers operating out of the Tillman Station.

43. The laughing and apparent joking between Doe II and the third officer who pulled up to the scene—combined with the fact this third officer expressed no concerns whatsoever about Mr. Billingsley's being detained and searched without probable cause—further suggests that the conduct of the officers towards Mr. Billingsley was typical practice for MPD officers operating out of the Tillman Station.

44. It has long been—and at all pertinent times was—the City's regular custom and practice to inadequately and improperly investigate reports of misconduct by subordinate members of the MPD. The City routinely did and does downplay and tolerate instances of egregious police misconduct, including misconduct substantially similar to that described above, and shields its bad cops from public scrutiny or serious disciplinary action.

45. The City routinely protects—and at all pertinent times protected—bad cops like John Does I and II by burying reports of officer misconduct in a bureaucratic morass.[2]

---

[2] *See, e.g.*, Marc Perrusquia, *"Taser Face": MPD officer's repeated use of stun gun prompts excessive force investigation*, Daily Memphian (Jul. 28, 2020, 4:00 AM), https://dailymemphian.com/section/metro/article/15705/taser-face-mpd-officers-repeated-use-of-stun-gun (updated Jul. 28, 2020, 6:59 AM).

46. The City routinely protects—and at all pertinent times protected—bad cops like John Does I and II by declining to refer use-of-force violations and other instances of police misconduct to the Shelby County District Attorney General for prosecutorial review.[3] Upon information and belief, had the MPD reported just some of the many of the instances it chose not to report, bad cops like John Does I and II would have regulated their conduct to avoid criminal prosecution.

47. It was and is the custom and practice of the City to inadequately train and supervise its subordinate officers, including John Does I and II, thereby failing to adequately discourage use-of-force and other police-policy or constitutional violations on part of these officers.

48. The City had been sued numerous times prior to the victimization of Mr. Billingsley as described above. Upon information and belief, many allegations in those prior lawsuits were true and put Michael Rallings, Prentiss Jolly, and the City on notice that use-of-force and other police-policy and constitutional violations were occurring with alarming and unacceptable frequency within the MPD.

49. As a result of the above-described customs, patterns, and practices of the City and MPD, Defendants Doe I and Doe II reasonably believed that their outrageous treatment of Mr. Billingsley would not subject them to serious discipline by their employer.

---

[3] *See, e.g.*, Marc Perrusquia, *Does the MPD seek review when officers go over the line?* DAILY MEMPHIAN (Jul. 13, 2020, 4:00 AM), https://dailymemphian.com/article/15395/mpd-memphis-police-criminal-reviews-excessive-force-brutality (updated Jul. 13, 2020 8:49 AM) ("'Why not just send [a possible criminal-misconduct case] to us? Just send it to us and let us look at it,' [Shelby County District Attorney General] Weirich said.").

50. As a result of the above-described customs, patterns, and practices Defendants Doe I and Doe II reasonably believed that their misconduct would not be sanctioned or seriously investigated, but instead would be tolerated and, if investigated, covered up.

51. The above-described customs, patterns, and practices of Rallings, Jolly, and the City reflect a deliberate indifference to the rights of persons under the custody, care, or control of MPD officers and were a proximate cause of the indignities and damages suffered by Mr. Billingsley at the hands of the MPD.

## VI.

## FEDERAL CAUSES OF ACTION

52. The allegations set forth in paragraphs 1–51 are reiterated and incorporated by reference as if fully stated hereunder.

53. The acts and omissions hereinabove described, engaged in under color of state authority by the Defendants, were objectively unreasonable and deprived Mr. Billingsley of certain rights secured to him by the United States Constitution, including but not necessarily limited to his

    (a)  Fourth Amendment right to be free from unreasonable searches and seizures;

    (b)  Fourth Amendment right to be free from the use of excessive force by law enforcement;

    (c)  Fifth and Fourteenth Amendment rights to due process under and equal protection of the law;

  (d) certain fundamental rights unenumerated in the United States Constitution but secured by the Ninth Amendment, including without limitation his rights to privacy and bodily integrity; and

  (e) Fourteenth Amendment right to the unabridged privileges and immunities due United States Citizens.

54. As evidenced by John Does I and II's actions described above, these men conspired with intent to deprive Mr. Billingsley directly or indirectly of equal protections, privileges, or immunities under the law.  That is, Does I and II conspired to unlawfully detain Mr. Billingsley, then to search him, thrust fingers inside of his anus, and threaten him with false criminal charges, and they would not have done these things but for Mr. Billingsley's race.

55. In furtherance of the conspiracy, Does I and II subjected Mr. Billingsley to the humiliation and degradation of having his anus forcibly penetrated against his will in public but would not have done so had Mr. Billingsley not been black.  As a result, Mr. Billingsley was injured and deprived of exercising his rights and privileges as a citizen of the United States.

56. The violations cited under this count caused Mr. Billingsley grievous injury—including pain and suffering and past and future emotional distress—and were sufficiently outrageous, egregious, and conscience-shocking to entitle him to the recovery of punitive or exemplary damages.

## VII.

## PENDANT CAUSES OF ACTION

57. The allegations set forth in paragraphs 1–51, 54, and 55 are reiterated and incorporated by reference as if fully stated hereunder.

58. The Defendants' acts and omissions hereinbefore alleged deprived Mr. Billingsley of certain rights, privileges, and immunities guaranteed to him by the Tennessee Constitution and other applicable state law.

59. The MPD officer's forcible penetration of Mr. Billingsley's anus violated his rights under the rape statutes cited above, as well as under Tenn. Code Ann. § 40-7-121 (governing body-cavity searches).

60. The MPD officers' acts and omissions as hereinbefore alleged constituted common-law battery; assault; conspiracy; intentional infliction of emotional distress; wanton indifference to human dignity; and injurious recklessness.

61. The violations cited under this count caused Mr. Billingsley grievous injury—including pain and suffering and past and future emotional distress—and were sufficiently outrageous, egregious, and conscience-shocking to entitle Mr. Billingsley to recover punitive or exemplary damages.

# VIII.

## REQUESTED RELIEF

62. WHEREFORE, Mr. Billingsley respectfully demands the following relief:

A. That process issue and Defendants be required to fully answer or respond to this Complaint within the time and manner provided by law;

B. That the City be required to release forthwith the identities of the officers described herein as John Does I and II so that their names may be amended to this action and they may be located and served with process;

C. That the City be compelled to conclude its internal-affairs investigation of the events described herein with all deliberate speed so that discovery in this action may commence unimpeded;

D. That a jury be empaneled to hear and decide the merits of all jury-triable issues set forth or fairly raised herein;

E. That upon a trial, Mr. Billingsley be awarded money damages, both compensatory and punitive or exemplary, in an amount to be determined according to the proof, but in no event less than **EIGHT HUNDRED FIFTY THOUSAND DOLLARS ($850,000.00)**;

F. That in addition to damages, Plaintiffs be awarded any and all costs, expenses, and reasonable attorney fees available by law; and

G. Such other and further relief as the Court may deem just and proper under the circumstances.

§        §        §

Dated August 5, 2020.

                                       Respectfully submitted,
                                       **APPERSON CRUMP. PLC**


                                       /s/ *Jacob Webster Brown*
                                       Jacob Webster Brown (TN 36404)
                                       Bruce S. Kramer (TN 7472)
                                       6000 Poplar Avenue, Suite 150
                                       Memphis, Tennessee 38119
                                       Telephone:   (901) 756-6300
                                       Facsimile:    (901) 757-1296
                                       jbrown@appersoncrump.com
                                       bkramer@appersoncrump.com
                                       *Attorneys for Plaintiff*